# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVIN LEE MILLIKAN, JR., | Case No. 1:17-cv-01360-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 14, 16, 17) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## I.

## INTRODUCTION

Plaintiff Marvin Lee Millikan, Jr., ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from affective disorder, atypical seizures, back pain, and joint pain. For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

/ / /

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 7, 8.)

1

**II.**

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff protectively filed an application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on May 28, 2013. (AR 118, 119.) Plaintiff's applications were initially denied on January 6, 2014, and denied upon reconsideration on May 23, 2014. (AR 156-160, 162-166.) Plaintiff requested and received a hearing before Administrative Law Judge Vincent Misenti ("the ALJ"). Plaintiff appeared for a hearing on April 28, 2016. (AR 36-75.) On August 16, 2016, the ALJ found that Plaintiff was not disabled. (AR 17-29.) The Appeals Council denied Plaintiff's request for review on August 29, 2017. (AR 1-3.)

**A.    Relevant Hearing Testimony**

Plaintiff appeared with counsel and testified at the April 28, 2016 hearing. (AR 40-71.) Plaintiff was thirty-five years old on the date of the hearing. (AR 40.) He was 6 feet 1 inches tall and weighed about 185 pounds. (AR 40.) He is single and lives in a trailer with his mother and cousin. (AR 40-41.) Plaintiff receives general relief. (AR 41-42.)

Plaintiff is unable to drive due to seizures. (AR 42.) Plaintiff attended school through the twelfth grade but did not receive a diploma. (AR 42.) His uncle mostly drives him around, but sometimes other family or friends will help him. (AR 42-43.)

Plaintiff has grand mal seizures on the average once a month where he blacks out. (AR 44, 61.) When he has a seizure episode, he will have three to four seizures during a five to ten-minute period. (AR 61.) The seizures each last about ten minutes so the whole episode will last forty-five minutes. (AR 62.) His longest episode was two days and his shortest episode was about four hours. (AR 63.)

When he has a grand mal seizure, he does not know what happens, he just wakes up in the hospital several hours or days later. (AR 43.) He does not know that he is going to have one. (AR 45.) In the last four years, his family and friends have become accustomed to the seizures so he has not been to the hospital. (AR 45-46.) His family tells him that he shakes convulsively for three to ten minutes and has three to four seizures per episode. (AR 46.) He has had seizures at

multiple places. (AR 46.) Now if he has a seizure he will put in his bed at home. (AR 46-47.) He will be in bed from several hours to two days after having a grand mal seizure depending on the severity. (AR 47, 67.) He blacks out and has bitten his tongue and his lip. (AR 47.) He has had them when he was standing up and has fallen and hit his head and back. (AR 47.) The previous September, he had a condition called rhabdomyolysis where he had two straight days of seizures. (AR 48.) He has had this happen a couple of times. (AR 48.) It takes him a month to recover from the rhabdomyolysis seizures. (AR 67.)

Plaintiff also has focal seizures, which are minor seizures, almost daily. (AR 48.) Most of them start out as déjà vu, he will see something that brings up a memory and he has an overwhelming feeling. (AR 48.) He will be quiet after that and will close his eyes. (AR 49.) He will put up his finger and tell people to give him a moment. (AR 49.) With a severe seizure he will go down on one knee for several minutes and will be completely quiet because it is such an overwhelming feeling. (AR 49.) He cannot talk and does not want any stimulation. (AR 49.) After that, he will go and lie down or sit down for an hour or two for a minor seizure and several hours or the rest of the day for the severe seizures. (AR 49.) He will sleep because the seizures make him tired. (AR 49.) The doctors have been unable to find the cause of his seizures. (AR 49.)

He woke up one day and was making breakfast when he had a grand mal seizure. (AR 50.) His daughter, who was 11 at the time, called his girlfriend and told her that he had had a seizure. (AR 50.) His girlfriend, a nurse, came over and he had another seizure when she was there. (AR 50.) His girlfriend called 9-1-1 and he was taken to Kaweah Delta Hospital. (AR 50.) He had a total of four seizures that day. (AR 50.) Plaintiff's seizures are very debilitating. (AR 53.) He used to be very active. (AR 53.) He has lost weight and fatigues easily, for example when playing with his son. (AR 53.) Yesterday, his hip popped when he was playing with his son. (AR 53.) His memory is horrible and he has trouble remembering to do his daily chores. (AR 53.) He has always been good at math and can just see the numbers in his head. (AR 56.) He is not able to do that anymore and the doctors have told him that is because of the part of his brain that is affected. (AR 56.) Prior to having seizures, Plaintiff never had anything wrong with

3

him.  (AR 55.)

Currently his seizures come in waves.  (AR 51.)  He has four to five focal seizures a day.  (AR 51.)  He rarely has a day where he does not have a focal seizure.  (AR 51.)  He has recently seen a neurologist at UC San Francisco who is considering surgery.  (AR 52.)  Prior to that he was seeing Dr. Kennedy at UC Davis but there was an insurance issue and he had to change doctors.  (AR 52.)  Dr. Kennedy had him go for a video EEG.  (AR 63.)  It was a three-day procedure where they took Plaintiff off all his medication.  (AR 63.)  They wanted all the medication out of his system so they could see if the medication was working.  (AR 63.)  The doctors want him to have a second EEG to be more precise.  (AR 65.)  They want to give him radiation to find the site of the seizures.  (AR 66.)  In the original EEG, they discovered it was his left front temporal lobe.  (AR 65.)

As he was talking, Plaintiff stated that he was having a focal seizure and that he felt like it lasted thirty minutes.  (AR 64.)  The attorney stated it was two maybe three minutes.  (AR 64.)  Plaintiff stated that he saw the green flashing light and he had the feeling that this was all a memory, a dream, and it was overwhelming.  (AR 64-65.)  He said his hands felt weird, like tingly, and his feet, cheeks, everything felt weird.  (AR 65.)  Plaintiff stated that the seizure he just had was a pretty bad one.  (AR 68.)  He would be in bed the rest of the day following it.  (AR 68.)

Plaintiff's hips hurt and he saw the doctor about it the other day.  (AR 57.)  He has problems with all his major joints but especially his hips since the seizures began.  (AR 57.)  As his seizures get worse, his hips have gotten worse.  (AR 57.)  It started with his right hip, then his left hip, and then his shoulders and his knees.  (AR 58.)  His primary care doctor wants him to start physical therapy because he has lost so much muscle mass.  (AR 58.)  The neurologists both think his pain is because he seizes so hard.  (AR 58.)  He has had x-rays and the doctors tell him he needs a CT scan.  (AR 58-59.)

On a typical day, Plaintiff gets up in the morning and showers.  (AR 54.)  His uncle calls him and reminds him of what he has to do that day.  (AR 54.)  He watches baseball during the baseball season.  (AR 54.)  He goes to the local Visalia Rawhide games which are free.  (AR 54.)

He sees his children and tries to do house work. (AR 54.) He enjoys cooking and will cook a couple times a week. (AR 54.) He likes to barbeque but does not do that much anymore. (AR 55.) He has to be reminded to do pretty much everything. (AR 55.) His daughter had a dance recital and he had to be reminded to go. (AR 55.) He does help his children with their homework, takes them to the park, watches movies and plays board games and cards with them. (AR 56-57.) His daughter likes to cook so he will cook with her. (AR 57.) His son likes art so Plaintiff will draw with him. (AR 57.)

Plaintiff can sit for 30 to 45 minutes before his feet start falling asleep. (AR 59.) He is unable to stretch, lift, or bend like he used to. (AR 59.) Plaintiff can lift 40 to 50 pounds. (AR 59.) He is unable to lift his eight-year-old son up. (AR 59.) Plaintiff can stand for 45 minutes and walk for 30 minutes. (AR 60.) Plaintiff takes Ibuprofen that he got a long time ago from a doctor for pain. (AR 60.) He does not receive any treatment on a regular basis for his pain. (AR 60.) He does not like the way opioids make him feel. (AR 60.)

A vocational expert, Stephen Schmidt, also testified at the hearing. (AR 71-73.)

**B.     ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2017.
- Plaintiff has not engaged in substantial gainful activity since the alleged on set date of April 5, 2012.
- Plaintiff has the following severe impairments: atypical seizures, back pain, and joint pain.
- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.
- Plaintiff has the residual functional capacity to perform a range of light work. He can lift and carry up to 20 pounds occasionally and ten pounds frequently. He is able to stand and/or walk up to six hours and sit for six hours over the course of an eight-hour workday. He can occasionally crawl and climb ramps or stairs. He is able to frequently balance, stoop, kneel, and crouch. He is unable to climb ladders, ropes, or scaffolds. He can

5

occasionally reach overhead bilaterally. He must avoid all exposure to unprotected heights and moving mechanical parts. He cannot perform commercial driving. He can tolerate occasional exposure to extremes of heat and cold. In light of the Plaintiff's description of impaired memory following a seizure event, he is able to perform simple, routine, repetitive tasks and can execute simple work-related decisions.
- Plaintiff is unable to perform any past relevant work.
- Plaintiff was born on August 27, 1980, and was 31 years old which is defined as a younger individual age 18-49 on the alleged disability onset date.
- Plaintiff has at least a high school education and is able to communicate in English.
- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is not disabled whether or not Plaintiff has transferable job skills.
- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.
- Plaintiff has not been under a disability as defined in the Social Security Act from April 5, 2012, through the date of this decision.

(AR 22-29.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ failed to provide specific and legitimate reasons to reject the opinion of his treating physician, Dr. Kennedy. Plaintiff argues that there is medical evidence supporting the existence of seizures and three months of adhering to prescribed treatment with seizures at least every month would meet the listing requirement and precludes reliance on other periods of time where Plaintiff may not have adhered to treatment.

Defendant counters that the ALJ properly considered the record and provided specific and legitimate reasons to give less weight to the opinion of Dr. Kennedy. Defendant argues that the ALJ noted that Dr. Kennedy's opinion was conclusory and offered general statements that Plaintiff was unable to work but this finding is reserved for the Commissioner. Further, Defendant contends that the ALJ properly determined that Dr. Kennedy's opinion was based on the September 2104 EEG when Plaintiff was not on his medication. Defendant points out that the ALJ did not address this as a failure to comply with treatment, but that Dr. Kennedy did not explain what Plaintiff's functional condition would be with treatment. Defendant argues that when asked to discuss Plaintiff's response to prescribe medication he did not provide any information beyond noting the medications and their side effects. Defendant contends that the ALJ noted that medications have been general proven effective in controlling Plaintiff's seizure activity and the record supports that when Plaintiff is taking his medication his condition is often noted as stable. Defendant notes that the ALJ properly found that Dr. Kennedy opined extreme physical limitations with little support. Finally, Defendant contends that the ALJ did not fully reject the opinion of Dr. Kennedy, but agreed that Plaintiff had a seizure impairment, and found he could perform a range of light work and restricted him to simple, routine, and repetitive tasks.

Plaintiff replies that the Commissioner's arguments are without merit. Plaintiff points out that the September 2014 EEG shows that he had nine seizures in one day, and Dr. Vesali examined Plaintiff prior to the EEG and did not have the benefits of seeing the EEG results. Plaintiff argues that Plaintiff was taken off his medication for the September EEG by his

8

physician for medical study purposes. Plaintiff contends that Dr. Kennedy supported his opinion by stating that stress can precipitate Plaintiff's seizures, and by reporting Plaintiff's symptoms such as loss of bladder control, confusion, muscle strain, exhaustion, and difficulties communicating. Plaintiff argues that the record shows that Plaintiff's medication levels were within the therapeutic range on September 2, 2014, and despite this the September 2-5, 2014 EEG described him as having two to three seizures per month.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)). The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957.

The ALJ gave minimal weight to the opinion of Dr. Kennedy in which he opined that Plaintiff "is absolutely unable to work in the foreseeable future." (AR 26, 787.) The ALJ found that this was not a medical opinion, but was an administrative finding dispositive of the case and such issues are reserved for the Commission. (AR 26.) While the ALJ must consider all medical evidence, "[t]he treating physician's opinion is not" "necessarily conclusive as to either physical condition or the ultimate issue of disability." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). But the ALJ may not simply reject the treating physician's opinion on the ultimate issue of disability. Ghanim v. Colvin, 763 F.3d 1154, 1154 (9th Cir. 2014). To reject the contradicted

9

opinion of the treating physician, the ALJ must provide specific and legitimate reasons that are supported by substantial evidence. Ghanim, 763 F.3d at 1154.

Dr. Kennedy completed a Seizure Source Statement on December 10, 2014. (AR 786-789.) Dr. Kennedy identified Plaintiff's seizures as nonconvulsive seizures with loss of consciousness. (AR 786.) He stated that sometimes Plaintiff has warning of impending seizures a few seconds before the seizure. (AR 786.) Dr. Kennedy stated that Plaintiff had seven seizures per week and each seizure varies but typically includes deep breathing, lip smacking, saying "please help me", moving items within his reach, excessive swallowing, and he occasionally has generalized convulsive seizures also. (AR 786.)

Dr. Kennedy identified Plaintiff's symptoms as a presence of aura, tongue bites or other injuries, and loss of bladder control. (AR 787.) Plaintiff has postictal phenomena of confusion, muscle strain, exhaustion, and difficulty communicating for several hours after seizure. (AR 787.) Dr. Kennedy opined that Plaintiff needs to rest for 24 hours after a seizure. (AR 787.)

Dr. Kennedy opined that Plaintiff is absolutely unable to work for the foreseeable future. (AR 787.) The positive test result supporting the opinion was a video EEG in which Plaintiff had 9 left temporal lobe seizures with one proceeding to become a convulsion. (AR 787.) Dr. Kennedy opined that Plaintiff is incapable of even low stress work and that exertion could precipitate a seizure. (AR 787.) Dr. Kennedy opined that Plaintiff is able to sit and stand/walk 0 to 1 hour max. (AR 787.) Plaintiff can sit and stand/walk less than two hours in an eight out workday. (AR 788.)

Plaintiff takes Vimpat, Keppra, Zonisamide, and Klonopin for his seizures, but Dr. Kennedy did not specify Plaintiff's response to the medications. (AR 788.) He stated that Plaintiff was compliant with his medications. (AR 788.) The medications have side effects of lethargy and lack of alertness. (AR 788.) Plaintiff has no associated mental problems. (AR 788.)

Dr. Kennedy stated that Plaintiff would need unscheduled breaks daily, and will have to rest several hours before returning to work due to seizures. (AR 788.) Plaintiff will likely have good and bad days and would miss more than 4 days per month due to impairments or treatment. (AR 788.) Dr. Kennedy opined that Plaintiff should avoid bending, stooping, working at heights,

and heat and cold as they could cause seizures or cause injury if he had a seizure. (AR 789.)

Here, the ALJ gave little weight to Dr. Kennedy's opinion because it was based exclusively on the results of a multi-day video EEG where Plaintiff experienced multiple seizures, however at the time, Plaintiff's medications had been ceased for the study. (AR 26, 776, 978.) Plaintiff argues that he was off his medications at the order of the physician and the ALJ is not free to second guess the diagnostic techniques of the physician. However, the ALJ's point was not that Plaintiff was off medication, but that the test that Dr. Kennedy relied on demonstrated Plaintiff's seizures when he was off his medication, but Dr. Kennedy did not address Plaintiff's condition when he was on medication. A condition that can be effectively controlled with medication is not disabling for the purposes of determining eligibility for Social Security Insurance benefits. Warre v. Commissioner of Social Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006). The ALJ noted that, as discussed within the opinion, Plaintiff's medications have been generally proven effective in controlling Plaintiff's seizures and he often went weeks between seizure events. (AR 26.)

The ALJ found that Plaintiff's seizures often occur in the context of poor compliance with medications. (AR 25.) The ALJ noted an August 3, 2012 emergency room visit in which Plaintiff reported that he forgets to take his medications intermittently and did not take them on that day prior to having a seizure. (AR 25, 455.) Plaintiff was found to be non-compliant. (AR 457.) On December 9, 2014, Plaintiff was at the emergency room after having seizures and stated that he had not taken any of his medication that day. (AR 25, 879, 880.) On March 30, 2015, Plaintiff went to the emergency room after having seizures and reported that he had forgotten to take his medication that morning. (AR 25, 854.) Plaintiff was seen in the emergency room on September 10, 2015, and it was noted that it was unclear if he was taking his medication. (AR 25, 928.) Plaintiff also reported that he misses doses of his seizure medications at a March 12, 2016 emergency room visit, although stated he was unsure if he had missed any recently. (AR 25, 836.) The ALJ also noted blood test results from November 30, 2013, which reflect that Plaintiff's Keppra level was only 8 while the reference range was 12 to 46 (AR 25, 620); blood test results from April 9, 2014, returned Zonisamide at 1.6 with reference range of 10.0-40.0 and

Lacosamide of 4.0 with reference range of 5.0-10.0 (AR 25, 1007, 1008); and blood test results from September 9, 2015 which returned a Keppra level of less than 2 while the reference range was 12-46 (AR 25, 813).

The ALJ found that Plaintiff's seizures seem generally well controlled when complaint with medications although it is not clear whether his daily marijuana usage influences his seizures. (AR 25.) The ALJ noted that, in February 2013, Plaintiff indicated that his last seizure had occurred in November 2012. (AR 25, 521.) Furthermore, Plaintiff had reported on November 11, 2013, that his last seizure occurred over three months earlier. (AR 25, 675.) The ALJ also noted that although Plaintiff's family reported on December 9, 2014, that he was having increased seizure frequency to one seizure per month (AR 25, 879); on June 7, 2015, Plaintiff could not recall when his last seizure occurred (AR 25, 847).

Review of the medical record supports the ALJ's findings. After Plaintiff's first seizure in April 2012, he was next seen complaining of seizure activity on August 3, 2012, at which time he reported not consistently taking his medication and had not taken medication that day. (AR 457.) Plaintiff was treated by Dr. Joshi for his seizures. On September 21, 2012, Plaintiff reported that his last seizure had been five weeks prior and Dr. Joshi noted that he was stable. (AR 342.) Similarly in December 2012, Dr. Joshi found Plaintiff was stable. (AR 522.) On February 14, 2013, Plaintiff reported that his last seizure was in November 2012 when he phased out for a few seconds. (AR 521.) Dr. Joshi noted that Plaintiff was stable. (AR 521.)

Plaintiff was seen in the emergency room for a seizure on April 3, 2013, and reported that he was compliant with his medication. (AR 436.) Dr. Joshi saw him that same day and recommended that Plaintiff stop working with heavy machinery. (AR 520.) On April 17, 2013, Plaintiff reported having an absence seizure after being placed on new medication. (AR 402.) He reported that he had not had any seizure activity since that time. (AR 402.) On April 25, 2013, Plaintiff saw Dr. Zamani reporting that he had three seizures that month and wanted to be referred to a new neurologist because his prior neurologist had taken him off disability. (AR 332.)

In May 2013, Dr. Joshi noted that Plaintiff was stable. (AR 517, 518.) On June 23, 2013, Plaintiff presented to the emergency room complaining of multiple seizures. (AR 377.) He

reported that his medication had been changed two weeks prior. (AR 377.) The emergency room physician discussed the case with Dr. Joshi who suggested that Plaintiff might be having break through seizures while they were slowly increasing his medication. (AR 378.)

Plaintiff saw Dr. Joshi on July 7, 2013, and reported no seizures and that he was more stable since his medication had been increased. (AR 516.) On July 12, 2013, Plaintiff was seen at the emergency room stating that he was possibly having seizures after he hit a tree and did not remember it. (AR 351.) The emergency room physician discussed the case with Dr. Joshi who stated that Plaintiff made some questionable statements to her and she felt that Plaintiff might be in the need of psychiatric care. (AR 351.)

Plaintiff was next seen by Dr. Joshi on August 29, 2013, and found to be stable. (AR 543.) Plaintiff was seen in the emergency room on September 7, 2013 with an allergic reaction to medication. (AR 574.) On September 18 through 20, 2013, he was seen in the emergency room with chills and a headache. (AR 548, 575, 560.) On October 7, 2013, Plaintiff reported that his last grand mal seizure was three months ago. (AR 767.) On October 15, 2013, he reported no seizures since the prior week. (AR 757.)

On November 11, 2013, Plaintiff was seen for a seizure and reported that it had been three and a half months since his last seizure. (AR 675.) On November 13, 2013, Plaintiff was seen by Dr. Vesali and reported that his last seizure was a couple of years ago. (AR 595.) On November 29, 2013, Plaintiff was seen at the emergency room and reported having five seizures that day but did not remember if he took his medication the night before or that day. (AR 603, 657, 660.) He reported that his last seizure was two to three weeks ago and that he will sometimes go weeks to months at a time without having seizures. (AR 609.) Plaintiff was found to have poor compliance. (AR 605.)

Plaintiff had his initial visit with Dr. Kennedy on December 19, 2013. (AR 632-633.) On January 6, 2014, he was seen in the emergency room for back pain stating he hurt his back when he had a seizure five weeks prior. (AR 645.) On January 7, 2014, Plaintiff was seen by a physician's assistant and reported his last seizures were in November 2013. (AR 749.) He was seen again on February 20, 2014, requesting that disability paperwork be completed and reported

13

that he was having seizures every two and a half to three months with his last seizure in November 2013. (AR 744.) He reported that he had fewer aura seizures with his new medication. (AR 744.)

On March 25, 2014, Plaintiff reported to Dr. Kennedy that his last aura spell and grand mal seizure were in November 2013, and he had not had a staring spell for several weeks. (AR 728.) On April 7, 2014, Plaintiff reported that his last seizure was about a month ago and he had no grand mal seizures since 2013. (AR 740.) He also stated that his girlfriend had noticed an absence seizure a few times and he had a déjà vu or aura few days ago or that day. (AR 740.) Plaintiff's medication levels were tested on April 9, 2014, and were low. (AR 1007, 1008.)

On July 31, 2014, Plaintiff went to the emergency room reporting that he had two seizures. (AR 893.) On September 2, 2014, Plaintiff reported that he was having déjà vu seizures two to three times a month. (AR 978.)

On October 30, 2014, Plaintiff was seen reporting that he had a seizure. (AR 887.) On December 9, 2014, Plaintiff went to the emergency room reporting that he was having multiple seizures. (AR 879.) He reported that he had not taken his medications. (AR 879.)

Plaintiff was seen in the emergency room on February 4, 2015, and February 20, 2015, reporting that he had a seizure. (AR 868, 863.)

On April 30, 2015, Plaintiff was seen in the emergency room for a seizure and reported that he had forgotten to take his medication. (AR 854.)

On June 7, 2015, Plaintiff was seen in the emergency room after having a seizure. (AR 847.) The record notes that the seizure is related to Plaintiff's drinking lowering his seizure threshold. (AR 848.) Plaintiff went to the emergency room on June 13, 2015, stating he had run out of medication and was asymptomatic but wanted to get medication. (AR 843.)

Plaintiff was seen in the emergency room in August 2015, reporting that he was having seizures. (AR 968.) Plaintiff stated that he thought he was having seizures because he had not been using his medical marijuana over the prior week. (AR 968.)

Plaintiff was seen in the emergency room on September 9 through 13, 2015, for seizures and his medication levels were below therapeutic range. (AR 805, 813, 908, 910, 928, 933.)

Finally, the ALJ noted that recent treatment notes indicate that Plaintiff's seizures are stable with compliance and medications in therapeutic range. (AR 25.) On October 7, 2015, Plaintiff had blood testing which demonstrated results in or above the reference range. (AR 997-999.) On December 29, 2015, Plaintiff saw Dr. Hashem and there are no complaints regarding seizures. (AR 995-996.) On January 27, 2016, Plaintiff again tested above or within range for his medication levels with no complaints of seizures. (AR 989-993.) On February 25, 2016, Plaintiff reported no new seizure incidents. (AR 988.) There are no documented visits for seizures during this time period.

Plaintiff did report to the emergency room on March 12, 2016, and stated that he was not feeling well and reported that he sometimes missed doses of his epilepsy medication, but did not recall if he had done so recently. (AR 835, 838.) On March 22, 2016, Plaintiff was evaluated by Dr. Gupta who discussed the possibility of a temporal lobectomy. (AR 803.) Plaintiff reported that he had focal seizures 2 to 3 days a week, cluster seizures 3 to 6 a day for a couple days in a row, aura seizures once a month; and epilepticus seizures 4 to 5 times with the last being in September 2015. (AR 801.)

Plaintiff argues that Dr. Kennedy supported the restrictions in his opinion by stating that Plaintiff could not tolerate even low stress work, but does not address the restrictions that Plaintiff is only able to sit or walk/stand for 0 to 1 hour when, as the ALJ noted, Plaintiff testified at the hearing that he could lift 50 pounds, attends baseball games, cooks and takes his children to the park. (AR 26-27, 54, 56-57, 787.) Further, at the hearing Plaintiff testified that he can stand for 45 minutes and walk for 30 minutes. (AR 60.) The ALJ also noted that Plaintiff was seen in the emergency room on February 16, 2013, after getting in an altercation while at a bar; and on June 7, 2015, had a seizure while he was outside at a music event drinking beer. (AR 27, 445, 847.) This evidence is inconsistent with Dr. Kennedy's opinion that Plaintiff is only able to sit or stand/walk 0 to 1 hour max.

Finally, Plaintiff appears to argue that the ALJ should have further developed the record to determine if there was a three-month period in which Plaintiff was compliant with his medications but continued to have generalized tonic-clonic seizures occurring at least once per

month despite three months of treatment which would meet the listing 11.02, Epilepsy. Epilepsy is a listed impairment and meets the listing criteria only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment.[2] 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 11.00(C). " 'Despite adherence to prescribed treatment' means that you have taken medication(s) or followed other treatment procedures for your neurological disorder(s) as prescribed by a physician for three consecutive months but your impairment continues to meet the other listing requirements despite this treatment." Id. "If serum drug levels are available in your medical records, [the Commissioner] will evaluate them in the context of the other evidence in your case record." Id.

Further, "[g]eneralized tonic-clonic seizures are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions)." Id. § 11.00(H)(1)(a). "Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur." Id. § 11.00(H)(1)(b).

---

[2] Pursuant to Listing 11.02, epilepsy meets the listing requirement where it is "documented by a detailed description of a typical seizure and characterized by A, B, C, or D:"

> A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or
> B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or
> C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
> 1. Physical functioning (see 11.00G3a); or
> 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
> 3. Interacting with others (see 11.00G3b(ii)); or
> 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> 5. Adapting or managing oneself (see 11.00G3b(iv)); or
> D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
> 1. Physical functioning (see 11.00G3a); or
> 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
> 3. Interacting with others (see 11.00G3b(ii)); or
> 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> 5. Adapting or managing oneself (see 11.00G3b(iv)).

The evidence in the record, as discussed by the ALJ, demonstrates that Plaintiff's generalized tonic-clonic seizures generally occurred when he was not taking his medication without a legitimate reason; and therefore, would not meet the listing requirement.

Also, the ALJ did consider Plaintiff's blood levels to determine compliance with treatment and, as discussed above, found that Plaintiff's seizures are stable with compliance and when his medication levels are in the therapeutic range. (AR 25.) Plaintiff has pointed to no evidence that he had any tonic-clonic seizures during the time period where his blood test results demonstrated therapeutic levels of his medication. Further, although Plaintiff reported that he was compliant with his treatment, the ALJ discussed the evidence that conflicted with those reports. The ALJ could conclude that Plaintiff was not compliant with his medication where there was substantial evidence to support the conclusion, as there was in this instance. Lewis, 236 F.3d at 514.

The ALJ provided specific and legitimate reasons for the weight provided to Dr. Kennedy's opinion that are supported by substantial evidence in the record.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in the weight provided to Dr. Kennedy's opinion. Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Marvin Lee Millikan, Jr. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **November 27, 2018**

UNITED STATES MAGISTRATE JUDGE